[No. B172017. Second Dist., Div. Three. Jan. 27, 2005.]

AMERICAN CASUALTY COMPANY OF READING, PA., et al., Plaintiffs and Appellants, v.
GENERAL STAR INDEMNITY COMPANY, Defendant and Respondent.

1514

COUNSEL

Law Office of David J. Myers and David J. Myers for Plaintiffs and Appellants.

Wilson, Kenna & Borys and Lawrence Borys for Defendant and Respondent.

OPINION

**CROSKEY, Acting P. J.**—In this case, arising from a dispute between liability insurers, we consider the scope and extent of coverage under an "additional insured" endorsement to a general liability policy that had been issued to Crowvision, Inc. (Crowvision), an independent motion picture company. The endorsement purported to provide limited liability coverage to a motion picture studio, Carolco Studios, Inc. (Carolco), in connection with the filming of a motion picture entitled The Crow (Miramax 1994). The principal issues presented by this appeal are (1) whether Civil Code, section 2782[1] may be applied to limit coverage, not otherwise disputed, under an "additional insured" endorsement, and (2) the impact on that coverage by the provisions of an indemnity agreement executed between Crowvision and Carolco.

We conclude that while section 2782 may preclude enforcement of a promise of indemnity in a construction contract, it does not limit the enforcement of an "additional insured" endorsement provided to the indemnitee by the indemnitor's liability insurer pursuant to the terms of the indemnity

---

[1] Civil Code section 2782, subdivision (a) (hereafter, section 2782), provides: "Except as provided in [sections not relevant to the issues before us], provisions, clauses, covenants, or agreements contained in, collateral to, or *affecting any construction contract* and which purport to indemnify the promisee against liability for damages for death or bodily injury to persons, injury to property, or any other loss, damage or expense *arising from the sole negligence or willful misconduct of the promisee* or the promisee's agents, servants or independent contractors who are directly responsible to such promisee, or for defects in design furnished by such persons, *are against public policy and are void and unenforceable*; provided, however, that *this provision shall not affect the validity of any insurance contract*, workers' compensation or agreement issued by an admitted insurer as defined by the Insurance Code." (Italics added.)

agreement. In addition, we hold that the provisions of the contract of indemnity will not preclude enforcement by the indemnitee of its claim of coverage under the additional insured endorsement. Finally where a claim has been resolved and satisfied by applicable primary coverage, an *excess* insurer may not be required to drop down and contribute to the cost of such resolution. As these conclusions are dispositive of the claim of appellants American Casualty Company of Reading, PA. (American) and Continental Casualty Company (Continental), we will affirm the judgment entered in favor of respondent General Star Indemnity Company (General Star) which was the excess liability insurer for Carolco.[2]

## *FACTUAL AND PROCEDURAL BACKGROUND*[3]

Crowvision and Carolco entered into a written License Agreement on or about December 29, 1992. In essence, under the terms of that agreement, Carolco granted to Crowvision the right to use certain stages, back lot, offices and other facilities at Carolco's studio located in Wilmington, North Carolina. The purpose of such use, which was granted through April 4, 1993, was to allow Crowvision to produce and film a motion picture entitled The Crow. The relevant provisions of the agreement required that Crowvision indemnify and hold Carolco harmless from all liability by reason of any injury or loss to persons (including employees of Crowvision) or property, resulting from ". . . *any cause whatsoever, or arising out of the condition of the licensed premises or any portion thereof . . . .*" This hold-harmless obligation, however, did not extend to any injury or loss resulting from the negligent acts or intentional misconduct of Carolco or its officers, agents or employees.[4]

---

[2] Although Continental was one of the plaintiffs below, it was not, as an *excess* insurer, affected by the trial court's judgment because the underlying third party claim was resolved and satisfied *without* exhausting applicable primary coverage. It was not, therefore, an aggrieved party. We will, therefore, in this opinion, limit our discussion to the dispute between American and General Star.

[3] The facts that we recite and upon which we rely are essentially undisputed. That is not to say that there are not factual disputes between the parties. Such disputes, however, relate to matters and issues that are not relevant to the decision that we reach herein.

[4] It should be noted that this indemnity limitation differs from the terms of section 2782 (see fn. 1, *ante*) which preclude indemnification of an indemnitee *only* if the indemnitee is solely negligent or guilty of willful misconduct. Specifically, the indemnity provision in the License Agreement stated, in relevant part: "[Carolco] is to be *free from all liability* by reason of any injury or loss to person or property, . . . *caused by . . . any cause whatsoever, or arising out of the condition of the licensed premises* or any portion thereof, . . . or arising out of the use or misuse of the licensed premises, . . . and [Crowvision] shall save, indemnify and hold [Carolco] harmless from any and all such claims, losses, damages, liability, demands, actions, suits, costs and expenses whatsoever, including reasonable attorneys' fees[,] arising out of such use or misuse; provided however, that *[Crowvision] shall neither indemnify nor hold [Carolco] armless from injuries or losses resulting from the negligent act(s) or intentional misconduct of [Carolco's] agents, officers or employees.*" (Italics added.)

'In addition, the agreement required that Crowvision procure and maintain liability insurance with a combined single limit of bodily injury and property damage coverage in the amount of not less than $2 million. Such insurance was required to provide coverage for Crowvision, and its authorized representatives, against all liability arising out of and in connection with the use, possession or occupancy of the Carolco premises. The agreement required that Carolco be added as an additional insured to Crowvision's policies.

Crowvision procured liability insurance in connection with the production and filming of The Crow from American and Continental. American issued a *primary* policy with $1 million/$2 million policy limits.[5] Continental issued a commercial *umbrella* policy with a $5 million policy limit. Each of these insurers issued a timely Certificate of Insurance confirming Carolco's status as an additional insured under their respective policies.

Carolco also carried its own liability insurance. TIG Insurance Company (TIG) issued to Carolco a *primary* general liability policy with a $1 million policy limit. General Star issued to Carolco a commercial *umbrella* liability policy. The policy issued by General Star provided that it was "excess over any other insurance, whether primary, excess, contingent or on any other basis, except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance . . . . We will have no duty . . . to defend any claim or suit that any other insurer had a duty to defend."[6]

On February 1, 1993, during the term of the License Agreement, and while the above described insurance policies were in effect, an employee of Crowvision, James L. Martishius, was seriously injured while operating a lift

Thus, on its face, the contractual limitation on the indemnity provisions of the License Agreement would appear to be broader than the limitation set out in section 2782. Crowvision undertook no obligation to indemnify Carolco for any loss arising from a negligent act of Carolco, apparently *whether or not it was the only negligent act contributing to the loss.* Nonetheless, American does not argue that the License Agreement should be read to preclude indemnity to Carolco where it was only one of two or more negligent parties. American limits its argument to the impact of section 2782. In view of the result we reach, however, it would make no difference if such an argument were advanced. Our conclusion regarding section 2782's "sole negligence" requirement would have a fortiori application to any contention that indemnity was barred under the terms of the License Agreement where Carolco's negligence was only a contributing rather than the sole cause of a claimant's injuries.

[5] American issued a "Special Insured Endorsement" which amended the definition of "Who is Insured" by defining as an additional insured "Lessors of premises rented or leased to [Crowvision] for occupancy for filming operation." There is no dispute that such definition included Carolco for the period relevant to the issues raised in this case.

[6] The parties have not cited any portion of the record reflecting the policy limit of General Star's policy. In view of the result we reach, however, this omission is not relevant.

used in the construction of a set for The Crow.[7] In 1994, Martishius filed an action in the North Carolina court system against both Crowvision and Carolco to recover damages for his injuries. The action was dismissed as to Crowvision due to North Carolina's workers' compensation exclusivity rules.[8] A judgment, however, was later entered on January 23, 1999, against Carolco in the sum of $1,744,922.[9]

On or about August 19, 2002, after this judgment became final, it was fully discharged by payments made by American and TIG.[10] American noted in its brief that it did not dispute coverage under its policy since the accident "occurred during the construction of a set for the film 'The Crow' and thus was a part of Crowvision's 'operations' during which Martishius was not only anticipated but intended to be present at the location of the injury."[11]

On January 24, 2001, American had filed this action seeking to compel General Star (Carolco's excess insurer) to contribute to or pay the amount of the judgment (which was then not yet final). Its complaint sought declaratory relief and "equitable indemnification/contribution, allocation and reimbursement."

After the filing of further pleadings, including a cross-complaint by General Star, American filed a motion for summary judgment which was opposed. On February 25, 2002, the trial court denied the motion, rejecting

---

[7] The record reflects that Martishius raised a part of his lift into some high tension electrical wires that had been strung over a portion of Carolco's back lot. As a result, it cannot be disputed that his injury resulted or arose from a condition of the premises rented to Crowvision by Carolco.

[8] It appears that the law of North Carolina on this issue is substantially the same as that of California.

[9] This judgment was ultimately affirmed by the North Carolina Supreme Court on May 10, 2002, in *Martishius v. Carolco Studios, Inc.* (2002) 355 N.C. 465 [562 S.E.2d 887].

[10] The trial court, in this action, had made an interim order, on February 25, 2002, that required American and TIG to share the defense and indemnity obligations equally. Specifically, the court's order stated, in part: "[B]ased on (1) the undisputed evidence before the Court that American [] and TIG were both primary insurers of the loss giving rise to the [Martishius] Action, with $1 million policy limits, and Continental Casualty and General Star provided excess coverage only, and (2) the evidence of disputes between the parties concerning their respective responsibilities regarding settlement and indemnification of the [Martishius] Judgment, the Court determines that it is nonetheless appropriate to enter an interim Order requiring American [] and TIG to share defense costs and indemnity obligations equally (i.e., 50/50) related to the [Martishius] Action until exhaustion of their policy benefits. . . ."

[11] Specifically, American stated in its opening brief: "[American does] not dispute coverage, since the accident occurred during the construction of sets as part of Crowvision's 'operations,' during which Martishius was not only anticipated but intended to be present at the location of the injury. The accident also arguably arose from rented 'premises,' to the extent the accident was associated with Crowvision's use of the licensed premises."

American's principal argument that the record established that (1) the injuries to Martishius were the result of the "sole negligence" of Carolco and (2) section 2782 therefore prohibited enforcement of American's indemnity obligation.[12] The trial court concluded that there was no basis on which it could find that there had been negligence *only* by Carolco. Moreover, since the judgment in the Martishius action was not yet final (and did not become final until May 20, 2002), it could not engage in any final apportionment of responsibility. It therefore made an *interim* order of apportionment requiring American and TIG to share equally the defense and indemnity burden of the Martishius action. (See fn. 10, *ante*.)

In December, 2002, American filed a second motion for summary judgment to which General Star responded with a cross-motion for the same relief. After some delay, these matters came on for hearing on July 14, 2003. The trial court, on September 29, 2003, issued its ruling denying American's motion and granting General Star's. It entered its judgment on November 17, 2003.[13] American has filed this timely appeal.

## CONTENTIONS OF THE PARTIES

American, claiming that its liability is barred because of the "sole negligence" limitation of section 2782, argues that the trial court improperly made a factual determination that the injuries to Martishius were *not* necessarily the result of Carolco's "sole negligence." In American's view, the trial court

---

[12] American also argued that, for the same reason, its insured, Crowvision, owed no duty under the License Agreement to indemnify Carolco for Carolco's own negligence. As we explain, that issue is not relevant to this dispute which relates to the existence and extent of coverage under an additional insured endorsement added to a liability policy issued to a contractual indemnitor. We do not have before us any question of liability under the indemnity provisions of the License Agreement between Crowvision and Carolco. For example, neither Carolco nor General Star is seeking to enforce Crowvision's promise of indemnity. In any event, given the finality of the North Carolina judgment against Carolco, and the language of the indemnity provisions (see fn. 4, *ante*), we do not see how any claim could be made that Crowvision had any obligation to indemnify Carolco. Put another way, we concede American's point, but that is not our issue. We are deciding the extent of American's and General Star's liability inter se under their respective insurance policies.

[13] The trial court's judgment granted General Star's request for favorable declaratory relief and stated, in part: "As to the payment of that judgment, the Court concludes that the American Casualty and TIG policies were and now are the primary policies liable to satisfy the final judgment obtained by James Martishius against Carolco in connection with that certain civil action filed in the State of North Carolina and that the primary policies are sufficient to satisfy the judgment. [¶] General Star's umbrella policy is excess to the policies of American Casualty and TIG for satisfaction of the Martishius judgment against Carolco. Because there were adequate primary limits, General Star has no obligation to pay any portion of the judgment and had no duty to defend. Plaintiffs are not entitled to contribution or reimbursement from General Star for the money paid to satisfy the Martishius judgment or for payment of defense costs."

rejected its "sole negligence" argument on the "mere possibility" that there also had been negligence on the part of Crowvision or others, but without any admissible evidence supporting that conclusion. It is American's position that since the record reflects negligence only by Carolco, Crowvision has no liability to indemnify Carolco under the terms of the License Agreement. Since Crowvision has no indemnity liability under its contract with Carolco, American contends that it likewise should have no liability under the additional insured endorsement to its policy.

General Star disagrees and asserts a number of contentions attacking, inter alia, American's principal argument that the "sole negligence" limitation in section 2782 precludes any liability under American's policy. It is General Star's position that the trial court correctly analyzed the respective obligations of it and American and that General Star's motion for summary judgment was properly granted.

### DISCUSSION

#### 1. *Standard of Review*

■ Summary judgment is properly granted when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719].) ■ After examining documents supporting a summary judgment motion in the trial court, this court independently determines their effect as a matter of law. (*Hulett v. Farmers Ins. Exchange* (1992) 10 Cal.App.4th 1051, 1057–1058 [12 Cal.Rptr.2d 902].) ■ A moving defendant bears the burden of establishing, by declarations and evidence, a complete defense to the plaintiff's action or the absence of an essential element of the plaintiff's case. (*Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1726–1727 [22 Cal.Rptr.2d 781]; Code Civ. Proc., § 437c, subd. (f).) The moving party must demonstrate that under no hypothesis is there a material factual issue requiring a trial. (*Flowmaster, Inc. v. Superior Court* (1993) 16 Cal.App.4th 1019, 1026 [20 Cal.Rptr.2d 666].) Where, as here, the critical facts are undisputed, the court can resolve the question of law in accordance with general summary judgment principles. (*Adams v. Paul* (1995) 11 Cal.4th 583, 592 [46 Cal.Rptr.2d 594, 904 P.2d 1205].)

#### 2. *General Star Is an Excess Insurer and All Applicable Primary Coverage Had Not Been Exhausted*

■ It is clear from the record that General Star had exposure only as an excess insurer. Thus, it would have no liability under its policy until exhaustion of all applicable primary policies. (*Community Redevelopment*

*Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329, 339 [57 Cal.Rptr.2d 755].) Absent such exhaustion, or a basis for a claim of equitable subrogation—an issue we discuss below, American cannot assert a basis for recovery against General Star since there is no obligation of contribution between primary and excess insurers. This is so because they are not on the same level of liability, absent a specific agreement to the contrary. (*St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.* (2003) 111 Cal.App.4th 1234, 1253 [4 Cal.Rptr.3d 416].)

■ As we have previously explained, "[t]here is a distinction between primary and excess insurance coverage . . . . '*Primary* coverage is insurance coverage whereby, *under the terms of the policy,* liability attaches *immediately* upon the happening of the occurrence that gives rise to liability. [Citation.] Primary insurers generally have the primary duty of defense. [¶] "*Excess*" or *secondary* coverage is coverage whereby, *under the terms of the policy,* liability attaches only after a predetermined amount of primary coverage has been exhausted.' (*Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 597–598 [178 Cal.Rptr. 908], italics in original, fn. omitted.) [¶] The 'excess' insurance referred to in this definition is that *secondary* insurance which provides coverage after other *identified* insurance is no longer on the risk. The identification of the underlying primary insurance may be as to (1) a particular policy or policies that are specifically described or (2) underlying coverage provided by a particular and specifically described insurer. In short, excess insurance is insurance that is expressly understood by both the insurer and insured to be secondary to specific underlying coverage which will not begin until *after* that underlying coverage is exhausted and which does not broaden that underlying coverage. [Citation.]" (*Century Surety Co. v. United Pacific Ins. Co.* (2003) 109 Cal.App.4th 1246, 1255 [135 Cal.Rptr.2d 879]; see also *Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1076 [85 Cal.Rptr.2d 627].) As we have indicated, General Star's umbrella policy was such excess insurance.

These authorities establish that General Star could have no liability to contribute to the defense or indemnity of *Carolco*, in any event, unless and until the primary coverage provided to *Carolco* had been exhausted. It is undisputed that, in this case, the defense of *Carolco* and discharge of the Martishius judgment was within the primary coverage of TIG and American. These were the primary insurers. General Star's umbrella policy expressly provided excess coverage. Since the primary coverage had not been exhausted, General Star's duty to drop down and provide any coverage never arose and, as a result, it had no obligation to contribute to the defense or indemnity expenses incurred by American in the resolution of the Martishius action.

In order to defeat this conclusion, American essentially claims that it is entitled to be relieved of its entire burden on the ground that its insured, Crowvision, had no duty to indemnify Carolco under the indemnity provisions of the License Agreement. Therefore, American argues, it should have no obligation to pay any part of the defense and indemnity costs incurred to resolve the Martishius action. Put another way, American seeks to avoid its obligation to share that burden under the principles of equitable contribution and to shift the entire liability for the Martishius judgment to Carolco's insurers. Essentially, American is asserting a claim for equitable subrogation based on the proposition that the scope and extent of Crowvision's contractual liability to indemnify Carolco defines and controls American's liability under the additional insured endorsement provided to Carolco.

### 3. *Principles of Equitable Subrogation and Equitable Contribution*

■ As we address American's contentions, it is worthwhile to keep in mind the essential differences between equitable subrogation and equitable contribution. "The right of subrogation is purely derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. The subrogated insurer is said to ' "stand in the shoes" ' of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have. [Citations.]" (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1292 [77 Cal.Rptr.2d 296].)

■ Equitable contribution, on the other hand, is entirely different. "It is the right to recover, not from the party *primarily* liable for the loss, but from a *co-obligor* who *shares* such liability with the party seeking contribution. In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others.

[Citations.]" (*Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 65 Cal.App.4th at 1293.)[14]

 "Unlike subrogation, the right to equitable contribution exists independently of the rights of the insured. . . . Equitable contribution . . . assumes the existence of two or more valid contracts of insurance covering the particular risk of loss and the particular casualty in question. . . . [Citations.] [¶] This right of equitable contribution between coinsurers is not based on, and indeed has nothing to do with, the coinsurers' subrogation to the rights of their insured against the party legally and primarily responsible for the loss. Whereas subrogation requires that the party to be charged be in an 'equitable position . . . inferior to that of the insurer' such that justice requires the entire loss be shifted from the insurer to the party to be charged [citation], contribution permits liability for the loss to be allocated among the various insurers without regard to questions of comparative fault or the relative equities between the insurers. [Citations.]" (*Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 65 Cal.App.4th at 1295–1296, italics omitted.)

As indicated, it appears that American is essentially asserting a claim for equitable subrogation and contends that since its insured, Crowvision, has no liability to Carolco under the indemnity provisions of the License Agreement, then it should have no liability under its insured endorsement. Putting it simply, American asserts that this conclusion must flow from the impact of section 2782 and its contention that the indemnity agreement negates its liability under the "additional insured" endorsement.[15]

### 4. *Section 2782 Limits Scope of Indemnity Available in Construction Contracts*

 By its express terms, section 2782 limits the scope of potential indemnity promises in *construction contracts* (see fn. 1, *ante*). It declares

---

[14] The trial court was applying these principles when it ordered American and TIG to share equally the cost of defending and indemnifying Carolco in the Martishius action.

[15] We note that the License Agreement provides (at par. 12.01) that liability insurance which Crowvision was required to carry "shall include a waiver of subrogation against [Carolco]." It is, however, not at all clear that such a waiver was in fact included in American's policy. Indeed, paragraph 8 of the General Liability Conditions appears to provide to the contrary. Further, given the factual circumstances of this case (particularly the judgment entered against Carolco in the Martishius action), it is arguable that American would not be barred from seeking equitable subrogation merely because Carolco was an additional insured under American's policy. (See, e.g., *Truck Ins. Exchange v. County of Los Angeles* (2002) 95 Cal.App.4th 13, 25 [115 Cal.Rptr.2d 179].) Although the effective nature of American's position necessarily relies on equitable subrogation principles, neither party has directly argued the issue, but both have simply made passing reference to the purported waiver. For all of these reasons, we have ignored the waiver issue and will directly address the merits of American's contention that it is entitled to transfer the *entire* Martishius loss to Carolco's primary and excess insurers.

unenforceable, as contrary to public policy, any provision purporting to indemnify a promisee (in this case, Carolco) for any injury or loss "arising from the *sole* negligence or willful misconduct" of the promisee. (§ 2782, italics added.) American relies heavily on this statutory language and argues that the record demonstrates that the injury to Martishius arose from the sole negligence of Carolco and therefore it should have no liability for any portion of the Martishius judgment[16] because (1) Crowvision, its insured, would, in such circumstance have no duty to indemnify Carolco and therefore there could be no viable claim under American's policy, and (2) section 2782 not only limits the scope of an indemnity agreement contained in a construction contract, but also applies to the enforcement of an "additional insured" endorsement provided in accordance with the named insured's commitment in such construction contract.

What these arguments ignore is that we do not have before us a dispute about the enforcement of an indemnity provision in a construction contract. The dispute presented in this case involves the enforcement of the additional insured endorsement to a liability policy issued by American. That insurance policy is an entirely separate contract and its enforcement is expressly not limited by section 2782. Thus, we need not concern ourselves with the extensive substantive and procedural arguments asserted by the parties on such issues as to whether (1) the License Agreement constituted a "construction contract" so as to come within the scope of section 2782[17] or (2) the trial court improperly decided on summary judgment the disputed factual issue of Carolco's alleged "sole negligence." These issues are simply not relevant to the enforcement of American's separate and independent promise of coverage to Carolco.

### 5. *American Is Required to Provide Coverage to Carolco Under the Additional Insured Endorsement*

Section 2782 expressly states that its "sole negligence" limitation "shall not affect the validity of any insurance contract." As we read the clear import of that language, a provision in a liability policy providing coverage to an additional insured will not be deemed contrary to public policy or unenforceable merely because that additional insured party may have incurred

[16] If American's argument was correct, then General Star would be exposed to liability as an excess insurer since the policy limit of TIG (Carolco's primary insurer) was not sufficient to satisfy the Martishius judgment.

[17] General Star argues that the License Agreement was not a "construction contract," but rather a simple license to use for a particular purpose and for a specified period of time certain real and personal property belonging to Carolco. As we have accepted, arguendo, American's contention that the License Agreement was a "construction contract" within the meaning of section 2782, we have no need to discuss the merits of General Star's contrary argument.

claim liability due to its "sole negligence."[18] Put another way, absent contrary language in the policy or in the additional insured endorsement,[19] an indemnitee under a construction contract may enforce the commitment made by such endorsement to provide coverage for a claim arising from the indemnitee's negligence even though (1) section 2782 would preclude enforcement of the contractual indemnity promise made by the indemnitor, or (2) under the facts of the case and the terms of the contract of indemnity, the indemnitor had no obligation to provide indemnity to the indemnitee.

This conclusion is fully supported by the language of the endorsement provided to Carolco by American as well as a number of relevant decisions. Under the terms of that endorsement, Carolco was entitled, as an "additional insured," to the full indemnity and defense benefits promised under the policy, "but only with respect to liability arising out of [Crowvision's] operations or premises . . . rented to [Crowvision] . . . ." As already indicated, American concedes that the injury to Martishius was covered under the terms of its policy. What American contends, however, is that Carolco is not entitled to enforce the additional insured commitment. It does so on the grounds of Carolco's "sole negligence." We have already rejected American's argument under section 2782. We also reject American's arguments based on case authority, including a decision from this court.

In our view, there are three recent cases that are relevant to American's contention. In *Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321 [81 Cal.Rptr.2d 557] (*Syufy*) a building owner sought coverage under the terms of an "additional insured" endorsement issued by a general contractor's liability insurer as required by the terms of the construction contract. The contractor had been hired to do repair work on the roof of the owner's building. One of the contractor's employees was injured as he climbed through a hatch on the roof. This was the employee's only access to and from the roof, and it had been negligently maintained by the building owner. The employee was injured as he was leaving the job, and there was no claim that his injury resulted from anything other than owner's sole negligence. The additional insured endorsement was substantially identical to the one in this case.[20] Relevant to the issue raised here by American, *Syufy* held

[18] We again note here that it is not at all clear that Carolco's negligence was the *sole* cause of the injuries to Martishius. It has been established, however, that its negligence was *at least*, one of the causes. Such a conclusion would appear to be sufficient to negate any contractual indemnity obligation on the part of Crowvision, under the terms of the License Agreement (see fn. 4, *ante*).

[19] See, for example, the language of the additional insured endorsement at issue in *Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1086–1087, 1090–1091 [97 Cal.Rptr.2d 374].

[20] The *Syufy* court also disposed of questions of ambiguity in the language of endorsement and the scope of the phrase "arising out of" that are not, for good reason, raised in this case.

that when an insurer chooses not to limit the extent of coverage to be provided to an additional insured, "but instead grants coverage for liability 'arising out of' the named insured's work, the additional insured is covered without regard to whether injury was caused by the named insured or the additional insured. [Citations.]" (*Id.* at p. 330.)

 In *Fireman's Fund Ins. Cos. v. Atlantic Richfield Co.* (2001) 94 Cal.App.4th 842 [115 Cal.Rptr.2d 26] (*Fireman's Fund*), a contractor was hired to do work at an oil company's plant. In the course of that work, one of the contractor's employees was injured when he tripped on a step that had been negligently maintained by the oil company.[21] When the employee sued to recover damages for his injuries, the oil company sought coverage under the additional insured endorsement provided by the contractor's liability insurer, Fireman's Fund, as required by the construction contract. Fireman's Fund provided a defense under a reservation of rights arguing, inter alia, that since the accident resulted from the "sole negligence" of the oil company, it was not entitled to coverage. Again, the language of the additional insured endorsement was substantially identical to that contained in the endorsement provided by American to Carolco. Relying in part on the reasoning in *Syufy*, the *Fireman's Fund* court rejected a narrow reading of the "liability arising out of" language used in the endorsement's limitation on coverage and held that such language could not be read to mean that coverage was provided only for the *vicarious liability* of the additional insured. (*Id.* at pp. 852–853.) After reviewing a number of California and out-of-state cases, the *Fireman's Fund* court concluded, "there is no demonstrable public policy favoring a narrow interpretation of additional insured clauses. [Citation.] Rather, the majority view implies a public policy which favors freedom of contract and allows parties, if they so choose, to obtain coverage for the additional insured that goes beyond vicarious liability arising out of the negligence of the named insured." (*Id.* at p. 853.)

 In *Vitton Construction Co., Inc. v. Pacific Ins. Co.* (2003) 110 Cal.App.4th 762 [2 Cal.Rptr.3d 1], a subcontractor's liability insurer had issued an additional insured endorsement to the general contractor on a

---

*Syufy* held that any ambiguity would, based on settled principles, be resolved in favor of coverage (*Syufy, supra,* 69 Cal.App.4th at pp. 326–328) and the terms "arising out of" or "arising from" have consistently been given a broad interpretation when construing insurance policy language. "It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship. [Citation.]" (*Id.* at p. 328.)

[21] The *Fireman's Fund* court does not state that the employee's injuries resulted from the *sole* negligence of the oil company, but does note that even if a dispute on the point existed, it would "not [be] material to our decision." (*Fireman's Fund, supra,* 94 Cal.App.4th at p. 848, fn. 2.)

warehouse construction project. The subcontractor had been hired to cut a number of holes or openings in the roof of the warehouse for skylights and heating, ventilation, and air conditioning equipment (which were to be installed by another contractor). After it had completed its task and left the jobsite, a roofer fell through one of the open holes that the *general contractor* had negligently failed to cover. When it was sued by the roofer, the general contractor called upon the subcontractor's insurer to contribute to a settlement of the claim. The insurer refused and the general contractor filed suit. Once more, the relevant language in the additional insured endorsement was substantially the same as in the endorsement before us. The insurer argued that the subcontractor had done nothing wrong and was in no way negligent and in fact had left the jobsite prior to the accident; in other words, the accident resulted entirely from the negligence of the general contractor. The *Vitton* court, relying heavily on its own decision in *Syufy*, held that "the fact that an accident is not attributable to the named insured's negligence is *irrelevant* when the additional insured endorsement does not purport to allocate or restrict coverage according to fault. [Citations.]" (*Id.* at p. 767–768.) The court restated the conclusion that it had reached in *Syufy*. " 'Insurance companies are free to, and commonly have, issued additional insured endorsements that specifically limit coverage to situations in which the additional insured is faced with vicarious liability for negligent conduct by the named insured. [Citations.] We believe the better view is that when an insurer chooses not to use such clearly limited language in an additional insured clause, but instead grants coverage for liability "arising out of" the named insured's work, the additional insured is covered without regard to whether injury was caused by the named insured or the additional insured.' [Citation.]" (*Id.* at p. 768.)

While it is true that no issue regarding the existence or impact of a promise of contractual indemnity between the insured parties was raised in any of these three cases, we do not find them less persuasive because of that circumstance. *Syufy, Fireman's Fund* and *Vitton* all clearly set forth the rules to be applied in the interpretation and enforcement of "additional insured" clauses such as the one now before us and they make it clear that the "sole negligence" of the additional insured party will not, in the absence of contrary policy language, preclude that party from enforcing the coverage commitment. That section 2782 or similar language in an underlying indemnity agreement might have barred such party from enforcing the contractual indemnity promise does not mean that the "additional insured" coverage is not enforceable. *Syufy, Fireman's Fund* and *Vitton* are entirely consistent with the proposition that an "additional insured" endorsement creates a contractual obligation that is entirely separate and apart from any indemnification obligation that may exist in an underlying construction contract. Absent explicit contrary language in either the underlying indemnity contract or the

policy, enforcement of the coverage promise under the "additional insured" clause will not be precluded by the absence of a contractual indemnification obligation.

We thus believe that the principles articulated in *Syufy, Fireman's Fund* and *Vitton* have a persuasive impact on the disposition of this case. American disagrees and places heavy reliance on our decision in *St. Paul Fire and Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038 [124 Cal.Rptr.2d 818]. Unfortunately for American's argument, however, *St. Paul* involved different policy language and we held only that we could consider the underlying indemnity contract between the insured parties in order to resolve an ambiguity in the language of the "additional insured" endorsement. In *St. Paul*, a subcontractor's employee was at work feeding electrical lines through a conduit. Meanwhile, completely independent of this work, employees of the general contractor were pressure testing a pipe. During this testing, a portion of the pipe exploded and metal fragments struck the subcontractor's employee in the leg. (*Id.* at p. 1045.) When the employee filed suit, the general contractor sought coverage under an additional insured endorsement in the subcontractor's policy. That endorsement stated that coverage would be provided " 'only with respect to liability arising out of' " the subcontractor's " 'ongoing operations performed for' " the general contractor. (*Id.* at p. 1043, italics omitted.) In order to resolve the ambiguity of this policy language we looked at the terms of the underlying and contemporaneous subcontract and its indemnity provisions as part of the general circumstances. (*Id.* at p. 1058.) We concluded that the facts did not support coverage under this clause for two reasons. First, we noted the pipe explosion "had *nothing* to do" with the subcontractor's performance of the subcontract, "but rather resulted entirely from activities in which [the general contractor] was separately and independently engaged." (*Id.* at p. 1058–1059.) The injured employee's "presence nearby was *entirely incidental* to [the general contractor's] pressure-testing activity." (*Id.* at p. 1059.) Second, and most significantly, although the subcontract required the subcontractor to indemnify and provide liability insurance for the general contractor, this contractual indemnification promise was *"expressly* limited" to liability arising from *the subcontractor's own acts or omissions* (and thus "necessarily excluded indemnification for claims arising solely from the acts or negligent misconduct of [the general contractor]"). (*Ibid*, italics omitted.) Further, the subcontract only required the subcontractor to provide liability coverage for the general contractor with respect to claims arising from the *subcontractor's* " 'operations under [the Subcontract].' " (*Ibid.*) Thus, under the terms of the policy *as construed*, there was no coverage. That is far

different than saying, as American does here, that the absence of an indemnification obligation on the part of the contractual indemnitor precluded enforcement of the indemnitor's liability policy by the "additional insured" indemnitee.

Our conclusion in this matter is consistent with the recent decision in *Hartford Casualty Ins. Co. v. Mt. Hawley Ins. Co.* (2004) 123 Cal.App.4th 278 [20 Cal.Rptr.3d 128] (*Mt. Hawley*). In that case, the court holds that where an indemnitee general contractor is entitled to contractual indemnity from a subcontractor, pursuant to the indemnity provisions of the subcontract,[22] then the general contractor's insurer is thereby excused from liability for equitable contribution to the subcontractor's insurer. To hold otherwise, the *Mt. Hawley* court said, "would negate the indemnity provision in the construction contract." (*Id.*, at p. 282.) *Mt. Hawley* relied primarily on the Supreme Court's decision in *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97] (*Rossmoor*) which essentially involved the question as to whether an indemnitee's insurer was entitled, under principles of equitable subrogation, to enforce the indemnity promise made in the underlying subcontract. The *Rossmoor* court held that it was. In that case, a property owner had hired a contractor to construct a sewage pump station and sewer lines. The construction contract required the contractor to indemnify the owner for all claims arising out of the work. The owner was also to be named as an "additional insured" on the contractor's liability policy. After two of the contractor's employees were injured (one, fatally) by a cave-in of the open trench in which they were working, an action was filed against the owner. This suit was defended and settled by the owner's own liability insurer. The owner then filed an action against the contractor and its insurer, seeking indemnity for the amount that had been paid to defend and settle the employees' suit. The contractor's insurer filed a cross-complaint against the owner's insurer seeking to apportion the defense and indemnify costs in accordance with the "other insurance" provisions in the insurers' policies. At trial, it was determined that the owner's negligence, if any, was passive.

*Rossmoor* held that, under these circumstances, the owner's insurer was entitled to be subrogated to the rights of the owner under the indemnity provisions of the construction contract. Since the owner had a contractual right to full indemnity, its insurer was entitled to recover from the contractor the defense and indemnity costs it had incurred and such right of subrogation was not limited by the "other insurance" clauses of the two policies. Indeed, the existence of other insurance as of the date of the employees' claim was a mere fortuitous circumstance. (*Rossmoor, supra,* 13 Cal.3d at p. 634.) As the

[22] In *Mt. Hawley*, the subcontractor's liability to indemnify the general contractor under the terms of the subcontract was effectively conceded by the subcontractor's insurer.

*Rossmoor* court put it, ". . . to apportion the loss in this case pursuant to the other insurance clauses would effectively negate the indemnity agreement and impose liability on [the owner's insurer] when [the owner had] bargained with [the contractor] to avoid that very result as part of the consideration for the construction agreement." (*Id.*, at p. 634.) Applying these principles, *Mt. Hawley* held that where an *indemnitee* under a contract of indemnity is entitled to indemnification, *its* insurer will have no obligation to contribute to the cost of the defense and settlement of the underlying claim incurred by the indemnitor's insurer pursuant to the additional insured endorsement to its policy. (*Mt. Hawley, supra,* 123 Cal.App.4th at pp. 291–293.) This result will flow notwithstanding the provision of "other insurance" clauses in the respective insurance policies. (*Ibid.*) Indeed, the *Mt. Hawley* decision endorses the corollary proposition that where the insurer of a party entitled to contractual indemnification has paid to defend and indemnify the subject claim, then such insurer will be able to enforce, under principles of equitable subrogation, the indemnitee's right of contractual indemnity, and recover the full amount that it had paid out from the indemnitor and its insurer irrespective of the "other insurance" clauses in the two insurer's policies. (*Ibid.*)[23]

In this case, unlike in *Mt. Hawley*, there is no basis on which we could conclude that Carolco is liable to indemnify Crowvision for the costs of defending and settling the Martishius action. The most that we can say is that *Crowvision owed no duty to indemnify Carolco.* Carolco is an *indemnitee* under the terms of the License Agreement, not an *indemnitor*. Therefore, American, as Crowvision's insurer, is in no position to transfer liability for the defense and settlement of the Martishius action entirely to Carolco's insurers.[24] Thus, we are solely concerned with the extent of American's liability under the provisions of *its* additional insured endorsement. That liability should depend solely on the language of *its* policy, not on the language of a separate contract to which it is *not* a party. If American has *any* liability under *its* policy, then it is necessarily one of two primary insurers who have satisfied a claim against a common insured *without exhausting total primary coverage.* There is no basis for any claim by American for either contribution or subrogation against General Star, Carolco's excess insurer.

---

[23] In *Travelers Casualty & Surety Company v. American Equity Ins. Co.* (2001) 93 Cal.App.4th 1142 [113 Cal.Rptr.2d 613], the court appears to have reached a different conclusion. We are not persuaded, however, and for the reasons articulated by the *Mt. Hawley* court, we do not apply here the reasoning and conclusion of the *Travelers* decision. (See *Mt. Hawley, supra,* 123 Cal.App.4th at pp. 299–305.)

[24] As we have already noted, Carolco's primary insurer, TIG, has already paid one-half of those costs.

## *CONCLUSION*

While it appears, under the facts of this case, that Crowvision owed no indemnification obligation to Carolco, it does not follow that Carolco is precluded from enforcing the additional insured endorsement to American's policy. The License Agreement imposed no obligation on Carolco to indemnify Crowvision. So American has no basis for asserting a claim for equitable subrogation to recover the amount it expended to discharge the Martishius judgment. Similarly, American was not excused from liability, as one of Carolco's primary insurers, to share in the burden of defending and settling the Martishius action. As the threshold on General Star's excess policy was never breached, no basis exists for imposing liability on it to share in or contribute to any part of the defense and indemnity obligations owed to Carolco. Neither the language of the License Agreement nor section 2782 requires a different result. Therefore, the trial court properly granted summary judgment in General Star's favor. In light of that conclusion, we need not reach or discuss any of the multiple other issues raised by the parties.

## *DISPOSITION*

The judgment is affirmed. General Star shall recover its costs on appeal from American.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied February 10, 2005.